United States District Court
District of New Jersey

UNITED STATES OF AMERICA : CRIMINAL COMPLAINT

v. :

CHARLES KUSHNER : Magistrate No. 04-6120 (RJH)

RECEIVED
JUL 1 2 2004
AT 8:30 ______ M
WILLIAM T. WALSH, CLERK

I, the undersigned complainant, being duly sworn state the following is true and correct to the best of my knowledge and belief:

SEE ATTACHMENT A

in violation of Title 18, United States Code, Sections 371, 1503, 1513(e) and 2.

I further state that I am a Special Agent of the Federal Bureau of Investigation and that this complaint is based on the following facts:

SEE ATTACHMENT B

THOMAS A. MARAKOVITS, SPECIAL AGENT
FEDERAL BUREAU OF INVESTIGATION

Sworn to before me and subscribed in my presence,
July 12, 2004, at Newark, New Jersey

HONORABLE RONALD J. HEDGES
UNITED STATES MAGISTRATE JUDGE

Signature of Judicial Officer

ATTACHMENT A

Count One

From in or about August 2003 to on or about December 5, 2004, in Somerset County, in the District of New Jersey and elsewhere, defendant

CHARLES KUSHNER

did knowingly and willfully conspire and agree with others to persuade, induce, entice, and coerce an individual to travel in interstate commerce to engage in prostitution and sexual activity for which a person could be charged with a criminal offense, contrary to Title 18, United States Code, Section 2422(a), and did an act to effect the object of the conspiracy.

In violation of Title 18, United States Code, Section 371.

Count Two

From in or about August 2003 to on or about May 12, 2004, in Essex County, in the District of New Jersey and elsewhere, defendant

CHARLES KUSHNER

did knowingly and willfully, and with the intent to retaliate, take an action harmful to a person, namely Cooperating Witness 1 ("CW1"), for providing to a law enforcement officer truthful information relating to the commission and possible commission of a Federal offense.

In violation of Title 18, United States Code, Sections 1513(e) and 2.

Count Three

In or about December 2003, in Somerset County, in the District of New Jersey and elsewhere, defendant

CHARLES KUSHNER

did knowingly, willfully and corruptly endeavor to influence, obstruct and impede the due administration of justice, namely, a grand jury investigation being conducted in the United States District Court for the District of New Jersey.

In violation of Title 18, United States Code, Sections 1503 and 2.

ATTACHMENT B

I, Thomas A. Marakovits, a Special Agent of the Federal Bureau of Investigation, having conducted an investigation, including interviewing Cooperating Witnesses 1, 2 and 3, Co-Conspirators A and B, W-1 and W-2 and reviewing corroborating documents obtained through grand jury subpoena and through other sources, and having discussed this matter with other law enforcement officers, have knowledge of the following facts:[1]

1. In or about February 2003, the United States Attorney's Office for the District of New Jersey began a grand jury investigation into alleged violations of federal criminal law purportedly committed by defendant CHARLES KUSHNER and certain of his associates. The investigation, which remains ongoing, has focused on, among other things, defendant CHARLES KUSHNER's and his associates' alleged violation of federal tax and fraud statutes and defendant CHARLES KUSHNER's purported use of numerous real estate entities which he controls to violate federal campaign contribution laws. The existence of the federal grand jury investigation has been known to defendant CHARLES KUSHNER and his associates since at least in or about March 2003.

2. At various times from the spring of 2003 through the present, Cooperating Witness 1 ("CW1"), a close relative of defendant CHARLES KUSHNER and Cooperating Witness 3 ("CW3"), a former employee of one of defendant CHARLES KUSHNER's companies, have provided information and documents concerning this investigation to special agents of the Federal Bureau of Investigation and Internal Revenue Service - Criminal Investigation Division and to the grand jury.

3. Since shortly after the commencement of the grand jury investigation until the present, defendant CHARLES KUSHNER, through his representatives, has made regular efforts to convince the investigating federal law enforcement authorities that CW1, Cooperating Witness 2 ("CW2"), the spouse of CW1 and a former employee of one of defendant CHARLES KUSHNER's companies, CW3 and others were inciting the federal investigation and were generally untrustworthy. To this end, in or about March 2003, defendant CHARLES KUSHNER, through a respresentative, presented to the investigating federal law enforcement authorities an audio recording that had secretly been made against CW2 purporting to demonstrate CW2's obstruction of justice in connection with a civil law suit between defendant CHARLES KUSHNER and other family members.

4. In an effort to gain leverage over CW1 and CW2, in or about the August 2003, defendant CHARLES KUSHNER initiated a scheme to orchestrate the covert videotaped seduction of CW2. To this end, he

[1]To the extent the statements of others are set forth herein, they are set forth in substance and in part.

recruited Co-Conspirator A ("CCA") and Co-Conspirator B ("CCB"). In or about August 2003, defendant CHARLES KUSHNER told CCA that he wanted CCA to hire a woman to seduce CW2 and then capture the woman and CW2 having sex on videotape. Defendant CHARLES KUSHNER told CCA that he wanted to create the videotape to cause problems and personal difficulties for CW2. Defendant CHARLES KUSHNER provided CCA with a photograph of CW2 and personal and identifying information related to CW1, CW2 and another relative of CHARLES KUSHNER, including their New Jersey work and residential addresses. Defendant CHARLES KUSHNER paid CCA approximately $25,000 in cash as compensation for CCA's and CCB's roles in coordinating the scheme and to cover expenses.

5. From in or about August 2003 until in or about November 2003, the scheme stalled due to CCA's and CCB's inability to recruit a woman who was willing to be paid to seduce and have sex with CW2 on videotape. At various instances during this time period, CCA communicated to defendant CHARLES KUSHNER the difficultly that CCA and CCB were having in recruiting a woman for the operation against CW2.

6. In or about November 2003, in New York City, defendant CHARLES KUSHNER personally recruited a woman ("W1") -- known by defendant CHARLES KUSHNER to be a call girl -- to seduce and have sex with CW2 on videotape. Defendant CHARLES KUSHNER told W1 that he would pay her approximately $7,000 to $10,000 if she would have sex with CW2 on videotape. Defendant CHARLES KUSHNER further told W1 that he wanted to make the videotape so that he could have leverage over CW2.

7. In or about November 2003, at defendant CHARLES KUSHNER's office building in Florham Park, New Jersey, defendant CHARLES KUSHNER provided CCA with the telephone number of W1 and informed CCA that W1 was willing to take part in the planned seduction and videotaping of CW2 in return for money.

8. On or about December 3, 2003, W1 traveled from New York City to meet CCA and CCB at a motel in Bridgewater, New Jersey. CCA instructed W1 that she was to attempt to lure CW2 back to the motel by telling CW2 that her car had broken down. An attempt to introduce W1 to CW2 on this date failed.

9. On or about December 4, 2003, W1 traveled from New York City to Bridgewater, New Jersey to meet CCB at the same motel. Subsequently, CCB and W1 traveled to a nearby diner where CW2 had been surveilled by CCA. When CW2 exited the diner, he was approached by W1 who convinced CW2 to give her a ride back to her motel by claiming that her car had broken down. After CW2 and W1 arrived at the motel, W1 invited CW2 into her room. CW2 declined but exchanged telephone numbers with W1.

10. On or about December 5, 2003, W1 again traveled from New York City to Bridgewater, New Jersey in an attempt to seduce and

videotape CW2. For this purpose, CCB had installed a hidden video camera in W1's motel room.

11. After a telephone conversation between W1 and CW2, CW2 arrived at W1's motel room. Subsequently, W1 and CW2 had sexual relations which were recorded by the hidden camera installed by CCB.

12. For her role in the seduction and videotaping of CW2, W1 was paid approximately $7,000 to $10,000 in cash by CCA and CCB. The remainder of the $25,000 in cash originally paid to CCA by defendant CHARLES KUSHNER was divided between CCA and CCB.

13. On or about December 5, 2003, CCB delivered the videotape of CW2 and W1 having sexual relations to defendant CHARLES KUSHNER at his office building in Florham Park, New Jersey. In a conference room with an associate present, defendant CHARLES KUSHNER viewed the videotape and expressed satisfaction with it to CCB.

14. Subsequently, defendant CHARLES KUSHNER instructed CCA and CCB that he wanted copies of the videotape made -- including a version in which W1's face was pixelled out -- and still photographs created from the videotape. On a later visit, CCA and CCB delivered copies of the videotape and still photographs to defendant CHARLES KUSHNER at his office in Florham Park, New Jersey.

15. Shortly after the videotaping of CW2, defendant CHARLES KUSHNER instructed CCA that he wanted to make a similar videotape of CW3 having sex with a woman. Defendant CHARLES KUSHNER stated that he wanted to make the videotape so that he could cause problems and personal difficulties for CW3 if he had to. Defendant CHARLES KUSHNER advanced to CCA approximately $10,000 to $12,000 in cash for the project and expenses. Subsequently, defendant CHARLES KUSHNER provided CCA with personal and identifying information regarding CW3.

16. Shortly thereafter, CCB contacted a woman ("W2") referred to him by W1 who would be interested in seducing and videotaping CW3 for money.

17. In or about mid-December 2003, under the direction of CCA and CCB, W2 approached CW3 in the parking lot of an office building. As instructed, W2 asked CW3 if he would give her a ride to her motel as her car had broken down. CW3 agreed to drive W2 to her motel.

18. During the ride to the motel, W2 asked CW3 if he would like to come into her motel room for a drink. CW3 declined.

19. When CW3 and W2 arrived at the motel in Bridgewater, New Jersey, W2 again asked CW3 if he would like to come into her motel room for a drink. CW3 again declined and then drove away.

20. CCA and CCB paid W2 approximately $2,000 for her effort to lure CW3 to her motel room and videotape a sex act with him. CCA and

CCB divided the remainder of the money received from defendant CHARLES KUSHNER between themselves. CCA informed defendant CHARLES KUSHNER that the attempt to videotape CW3 having sex with a female was unsuccessful.

21. On or about May 7, 2004, certain associates of defendant CHARLES KUSHNER received letters from the U.S. Attorney's Office for the District of New Jersey indicating that they were targets of a federal grand jury investigation.

22. On or about May 8, 2004, defendant CHARLES KUSHNER contacted CCA and told him that he wanted to meet CCA the following day.

23. On or about May 9, 2004, defendant CHARLES KUSHNER instructed CCA that he wanted CCB to mail the videotape and still photographs of CW2 having sex with W1 to CW2's spouse, CW1, and to the children of CW1 and CW2. Defendant CHARLES KUSHNER further instructed that he wanted the videotape mailed from Canada and that he wanted it to arrive at CW1 and CW2's house immediately prior to a family party which was scheduled for the following weekend. CCA convinced defendant CHARLES KUSHNER that he should not send the video to the children of CW1 and CW2.

24. On or about that same day, CCA communicated defendant CHARLES KUSHNER's instructions about mailing the videotape and still photographs to CCB.

25. On or about May 10, 2004, CCB drove to a town in upstate New York, and mailed the still photographs and videotape in an envelope addressed to CW1 in Essex County, New Jersey.

26. A few days later, the envelope containing the videotape and still pictures of CW2 having sex with W1 arrived at the home of CW1 and CW2 in Essex County, New Jersey. CW1 opened the envelope and discovered its contents. CW1 and CW2 later turned the envelope and its contents over to federal law enforcement agents.